## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| HRD CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-0730 |
| | § | |
| LUX INTERNATIONAL CORP., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

This case arises from the effects of Hurricane Katrina on a processing plant in Pass Christian, Mississippi. The plaintiff, HRD Corporation, doing business as Marcus Oil & Chemical, owned wax that was at the plant when the hurricane hit. Some of the wax was processed and packaged in 1,000 to 2,000 pound bags, waiting for HRD to pick up. Some of the wax was unprocessed and stored in two rail cars in the railyard at the plant. The defendant, Lux International Corporation, doing business as Luxco Wax, owned and operated the processing plant. The storm surge resulting from Hurricane Katrina destroyed the processed wax and damaged the unprocessed wax. The surge also damaged the rail cars.

In this suit, HRD asserts claims under Texas law for breach of contract, bailment, negligence, and constructive trust. HRD seeks damages for the contaminated wax, a return of money paid to process the wax that was destroyed in the storm, the costs of repair for the tank cars, and consequential damages. (Docket Entry No. 1). Lux has answered and counterclaimed for breach of contract and *quantum meruit*, seeking storage expenses for the

wax and the rail cars.  (Docket Entry No. 24).

Lux has moved for summary judgment as to HRD's claims.  (Docket Entry No. 25). HRD has responded.  (Docket Entry No. 27).  Lux has replied.  (Docket Entry No. 32)  HRD has surreplied to the new evidence submitted in Lux's reply.  (Docket Entry No. 35). Although the summary judgment motion, response, reply, and surreply address the allegations in the complaint, they do not address the counterclaims.

Based on a careful review of the pleadings, the motion, response, and reply, the summary judgment evidence, and the applicable law, this court grants Lux's summary judgment motion, for the reasons explained below.  The parties must advise the court in writing no later than **July 25, 2007** of any remaining issues or whether dismissal is appropriate.

## I.    Background

The record includes the contract between HRD and Lux and two affidavits by Jim Fox, Lux's plant manager;[1] an affidavit by Dennis Donaghu, the former plant manager;[2] and two affidavits by Leonard Orloff, the insurance adjuster for Lux.[3]  HRD has submitted copies of faxes between HRD and Lux;[4] two affidavits by Joseph Bolduc, an HRD employee;[5]

---

[1] Docket Entry No. 25, Exs. 1, 1-A; Docket Entry No. 32, Ex. E.

[2] Docket Entry No. 25, Exs. 2, 2-A.

[3] Docket Entry No. 25, Ex. 3; Docket Entry No 32, Ex. F.

[4] Docket Entry No. 27, Ex. A.

[5] Docket Entry No. 27, Ex. B; Docket Entry No. 35, Ex. A.

excerpts from Bolduc's deposition;[6] documents relating to Lux's claim for insurance benefits for the damages to its plant and inventory;[7] a map of Pass Christian, Mississippi; and a description of Hurricane Katrina.[8]

In April 2005, HRD and Lux entered into a "toll processing" contract.  The parties define "toll processing" as the processing of feedstock belonging to one party by another party, for a fee based on the quantity processed.  The processing party usually handles feedstock for a number of customers.  Under the contract, Lux agreed to process HRD's liquid polyethylene wax into solid pellets, or pastilles.  HRD was responsible for transporting the unprocessed wax to the Lux plant and for picking up and transporting the processed wax either to HRD's customer or back to HRD's Houston plant.  HRD delivered the unprocessed wax by rail car.  When the wax was processed, it was placed into large bags and stored in Lux's warehouse in Pass Christian until HRD had the bags picked up.

HRD paid Lux a processing fee based on quantity. The contract did not include a charge for storing the unprocessed wax or for allowing the rail cars to remain for extended periods.  The contract did state that Lux would store HRD's processed wax without charge for a certain period and then charge a fee for continued storage.  (Docket Entry No. 25, Ex. 1-A; Docket Entry No. 27, Ex. A at 1–2).

The parties submitted different versions of the contract.  (Docket Entry No. 25, Ex.

---

[6]Docket Entry No. 32, Ex. A; Docket Entry No. 35, Ex. B.

[7]Docket Entry No. 27, Exs. C, D; Docket Entry No. 32, Ex. D.

[8]Docket Entry No. 32, Exs. B, C.

3

1-A; Docket Entry No. 27, Ex. A at 1–2).  Lux submitted an April 1, 2005 fax sent by its employee, Jay Zhu, to Joe Bolduc at HRD.  This proposal provided a $0.10 per pound tolling charge and stated that HRD was responsible for transportation.  Storage of the processed wax would be free for two weeks, after which Lux would charge a fee.  Bolduc agreed to the terms but did not date his signature.  (Docket Entry No. 25, Ex. 1-A.).  Bolduc wrote: "[HRD] agrees to your offer for two loads to be delivered this weekend.  We agree to discuss the agreement for future loads, if any, next week."  (*Id.* at 2).  Lux characterizes this agreement as the "only existing contract" between Lux and HRD.  (Docket Entry No. 25 at 2, Ex. 1 at ¶ 2).  HRD submitted several faxes communicating continued discussions over some of the contract terms.  (Docket Entry No. 27, Ex. A at 1–2).

Despite the continued discussion over the price, most terms remained undisputed.  The parties' toll processing contract did not contain a provision as to the time of performance.  The contract charged HRD with the responsibility for transporting the wax to and from the Lux plant.  The contract did not allocate or address the risk of loss during the time the wax was at the Lux plant.

The record shows that in May 2005, HRD delivered to the Lux plant a rail car (UTLX 645966) containing 152,740 pounds of unprocessed polyethylene wax.  On August 29, 2005, this wax had not been processed.  The loaded tank car was still on the railroad siding at the Lux plant on August 29, 2007, when Hurricane Katrina hit Pass Christian.  Another rail tank car containing HRD's unprocessed wax was also at the Lux facility on that date.  The record does not reveal when that rail car arrived at the facility.

On August 29, 2005, a large quantity of HRD wax that had been processed was stored in a warehouse at the Lux plant.   The processed material was stored in 1,000 to 2,000 pound bags.  HRD generally removed processed wax from the Lux plant by loading the bags onto large trucks operated by commercial trucks HRD hired.

On August 29, 2005, Hurricane Katrina caused severe damage to Lux's plant, equipment, and inventory.  Lux's facility is 1.75 miles from the shore of the Gulf of Mexico. Pass Christian is between seventeen and twenty-one feet above sea level.  (Docket Entry No. 25 at 2).  The storm resulted in an eleven-foot surge that flooded the Lux buildings and warehouses to an eight foot depth.  The water lifted the railcars off the tracks, damaging the cars and contaminating the wax inside them.  The processed wax product stored inside the warehouses was destroyed.

The manager of Lux's facility, Jim Fox, described in his affidavit the steps Lux personnel had taken to prepare the plant for the storm.  His affidavit states as follows:

> For a week prior to Hurricane Katrina's landfall, Lux personnel kept abreast of weather reports and were aware both of the strength of the storm and that it would come ashore somewhere in the Gulf Coast region.  Lux personnel began preparing the plant for the storm as soon as it was known that it would be striking the Gulf Coast.  The specific prediction that the eye of Hurricane Katrina would probably pass through or near Pass Christian, Mississippi was not known until early Saturday morning, August 27, 2005, two days prior to the storm's predicted landfall.

> On Saturday, August 27, 2005, Lux personnel, including myself, completed preparing the plant for the hurricane.  Light-weight equipment and materials were moved inside the warehouses, and all of the buildings were closed and locked.

> All the property on the premises, both that belonging to Lux and its customers was protected to the best of the Lux crew's ability, under the circumstances.  In general, I took the same sorts of precautions at the plant as I did for my own property.  I know of nothing I could have done, under the circumstances, to avoid the damage that occurred.

(Docket Entry No. 25, Ex. 1 at ¶¶ 9, 10).

In his affidavit, Fox explained that after the potential risk of the storm was known, HRD did not contact Lux to arrange to remove either the unprocessed wax in the railcars or the processed wax in the warehouse.  Fox explained that by August 27, 2005, no such transportation could have been arranged:

> On Saturday, August 27, 2005, two rail tank cars containing wax which belonged to Marcus Oil [HRD], together with finished material and wax that was to be processed, was located at the Pass Christian facility.  At this point in time, to the best of my knowledge, no transportation was available to remove tons of equipment and tons of wax material from the plant to a safer place.  Such an effort would have required a freight train and many heavy trucks, time to load the material, and time to complete these tasks.  Under normal weather conditions, arrangements to transport material from the plant were typically made 7–14 days in advance.  I know of no transportation that would have been available to transport the large amount of material on hand to a place out of the path of the storm, given the short notice and nature of the approaching storm.  In my view, moving the entire plant in the time provided was not an option available to Lux.
>
> Each rail tank car weighed many tons.  The tank cars could only be removed from the facility by attaching them to a train.  To my knowledge, no trains were available to transport the cars away from the plant with the short notice provided.
>
> The processed wax was stored in 1,000–2,000 pound bags, at the request of Marcus Oil [HRD].  These bags were

6

> typically removed from the plan by loading them onto large trucks operated by regular commercial haulers. Lux did not own any trucks, and, to my knowledge, no heavy trucks were available to transport wax sent to Lux by its customers once it was known that Katrina would likely strike the area.
>
> . . .
>
> In addition to Marcus Oil [HRD]'s materials, Lux's warehouses stored the wax materials of many of Lux's other customers. Each large bag or palette of processed material weighted from one to several tons. Lux did not have the ability to move this product out of the area or to higher ground in the limited time available, considering the extreme circumstances and risks presented by Katrina's approach.

(*Id.* at ¶¶ 12, 13, 14, 16).

Lux personnel evacuated the plant on August 28, 2005. (*Id.* at ¶ 18). Fox stated in his affidavit that the damage from the storm and storm surge was "unprecedented" and that he "knew of nothing that could have been done to avoid the damage." (*Id.* at ¶ 19).

HRD submitted an affidavit from Bolduc taking issue with Lux's account in several respects. Bolduc stated that Lux had unreasonably delayed in processing the wax that was delivered by rail car in May 2005, three months before Hurricane Katrina hit. Bolduc asserted that HRD had frequently urged Lux to complete processing the wax in this rail car. (Bolduc Affidavit, Docket Entry No. 27, Ex. B at 2). In this suit, HRD alleges that the delay in processing resulted in the loss of the rail car contents. HRD seeks damages of at least $180,000 for that loss. HRD alleges that the delay amounts to a breach of contract or was negligent. Lux contends that the wax in this rail car could not be processed because it had physical characteristics that made it incompatible with Lux's equipment. Lux asserts that

7

HRD was aware of the problem but did not arrange for the transportation of the rail car before the storm.  HRD denies any such problem and assets that Lux did not notify HRD of any such problem.  (Bolduc Affidavit, Docket Entry No. 35, Ex. A at 1–2).

Bolduc also asserted that based on his conversations with Lux personnel, the plant did not have a comprehensive disaster plan in place.  Such a plan, according to Bolduc, would have provided for the notification of customers of an impending hurricane well in advance of its expected arrival.  Bolduc stated that Lux did not "affirmatively" notify HRD of "its conclusion that damage from Hurricane Katrina was imminent."  Bolduc stated that had HRD received more advance warning from Lux about the particular dangers of the plant's close proximity to the Gulf of Mexico, HRD would have been in a better position to either remove its product from the Lux plant, or to have "chosen to do business with another plant in another location."  (Bolduc Affidavit, Docket Entry No. 27, Ex. B).

In his deposition, Bolduc testified that he was aware of Hurricane Katrina before it hit.  Indeed, he was preparing the HRD Houston, Texas facility for the storm.  (Docket Entry No. 32, Ex. A at 57).  Bolduc testified that he had several phone conversations with Lux about removing HRD's wax before Hurricane Katrina hit.  (*Id*. at 20).  HRD sent two trucks, each with the capacity to remove 40,000 pounds of wax, to Pass Christian.  These trucks picked up some of the processed wax before the storm hit.  (*Id*. at 43–44).  Bolduc testified that there was about 175,000 pounds of dry processed wax remaining, or four to five truckloads.  (*Id*. at 53).  The two trucks were "sent over within the days before the storm, those were sent over, because the storm was approaching, in order to get some materials out

of there" for "risk abatement." (*Id*. at 43, 50). After those trucks were sent, Bolduc told Lux that he "wanted to remove all of [the processed wax] and use contract carriers to do that; but like I say, there just wasn't time to do that because of Lux's need to do whatever they had to do to get ready for the storm." (*Id*. 22). This conversation was as late as Friday August 26, 2007. HRD did not make any efforts to remove the two rail cars of unprocessed wax as the storm was approaching. (*Id*. at 45).

In his deposition, Bolduc testified that he expected a call seven or eight days before the storm saying "Listen, we have a storm prep in this plant and it calls for notifying you that you have 'X' amount of your materials in our facilities, and you still have time to come get it." (*Id*. at 51–53). Bolduc acknowledged that he had never made such a call or operated a facility like Lux's, which held third-party materials. (*Id*. at 51–52). Bolduc claims that if he had received such a call, he would have sent "all of my trucks on my own that I have an any that I could scrounge up." (*Id*. at 53). HRD had four trucks and two or three drivers. (*Id*. at 53). Bolduc also testified he would have removed the rail cars "if there had been time." (*Id*. at 53). Bolduc acknowledged that even though he did not receive such a call, he had sent two trucks to Lux to pick up some of the bags of processed wax. (*Id*. at 43, 50). Fox testified that by the time the path of Katrina was known, there was no time or equipment available to move the rail cars or the remaining bags of wax.

Bolduc also faulted HRD for its conduct after the storm.  According to Bolduc, Zhu did not reveal that HRD's stock of processed wax had been lost but said merely that there had been some damage.  Bolduc stated that Zhu assured him that Lux had insurance for the property of third parties.  (Bolduc Affidavit, Docket Entry No. 35, Ex. A at 2).  As a result, HRD sent Lux a $15,548 check for processing wax that was still at the Lux plant when the storm hit.  HRD did not stop payment on a $32,500 check for processing wax, which it had issued just before the storm.  (*Id.*).  HRD asserts that had Lux revealed the true facts, it would not have paid either invoice because the processed material was lost or ruined.  HRD questions whether the "missing" wax had in fact ever been processed.  (Docket Entry No. 27 at 2).

HRD also questions whether Lux received insurance benefits that would cover third-party property.  HRD has attached an email from Orloff stating that "the goods in Lux International's possession belonging to HRD Corporation will be included in our claim presentation."  (Docket Entry No. 27, Ex. D).  Lux has submitted an affidavit from Orloff stating that "[n]o claim was submitted for the loss of property owned by third parties on the flood policy purchased by Lux for its Pass Christian facility."  (Docket Entry No. 25, Ex. C).  Lux has also submitted an itemized insurance claim with an affidavit explaining those claims and a second affidavit from Orloff explaining that Lux had intended to file a claim on the third-party materials stored at the plant but that Lux's damages exceeded the policy limits.  (Docket Entry No. 32, Exs. D, F).

HRD moves for summary judgment on the breach of contract, negligence, and

bailment causes of action.  Each is addressed below.

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

## III.    The Breach of Contract Claim

HRD alleges that Lux breached the toll processing contract by failing to return processed wax. According to HRD, Lux failed to return processed wax totaling over 270,888 pounds, having an approximate market value of $200,000. HRD sent Lux a $15,548 check after the storm and did not stop a check in the amount of $32,500 sent before the storm. HRD asserts that although Lux knew the processed product had been lost, Lux's

representative, Jay Zhu, told HRD that the product was only damaged and that insurance coverage was available.

HRD also asserts that Lux failed to process some of the raw wax in a timely fashion. As a result, according to HRD, the contents of one rail tank car was lost and the car itself was damaged. Lux denies that it breached any contract term, pointing out that it had processed the wax that HRD paid for but did not pick up before the storm. Lux argues that it was not obligated to process wax within a particular time period.

The essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston 2005, pet. denied). The toll-processing contract does not contain risk-allocation provisions. The contract did require Lux to provide processing services at a set rate per pound of wax delivered by HRD. In this suit, HRD has asserted that it paid $15,548.00 for processed wax and allowed a previously issued check in the amount of $32,500 to clear, even after Lux knew that it could not deliver the wax.

HRD first claims that there is "no evidence that the processing was ever done." (Docket Entry No. 27 at 2). Lux has provided competent summary judgment evidence that the wax stored in the warehouses had been processed and packaged in 1,000 and 2,000 pound bags. Lux's summary judgment evidence also shows that HRD's unprocessed wax was in rail cars. Fox testified that at the time of Hurricane Katrina, all the processing was completed except for the wax in the two rail cars. (Docket Entry No. 25, Ex. A; Docket Entry No. 32,

13

Ex. E at 1).  This testimony is consistent with Bolduc's, who testified that he knew four to five truckloads of processed wax were stored at Pass Christian and that wax in the two rail cars had not been processed.  (Bolduc Deposition, Docket Entry No. 25, Ex. A at 53, 44–45; Bolduc Affidavit, Docket Entry No. 35, Ex. A at 1).  There is no evidence that HRD was invoiced and paid for processing that was not ever done.

HRD argues that it should receive a refund for the payments for processing the wax that was destroyed in the storm.  (Docket Entry No. 35 at 1–2).  HRD alleges that Zhu's misrepresentation that the allegedly processed wax merely damaged and  not destroyed induced HRD to pay for the processing services even though the wax could not be picked up. (*Id.*).  Fox's affidavit and Bolduc's deposition testimony show that all but two rail cars of wax had been processed; there is no evidence that HRD was invoiced for or paid for processing that was not completed.  The contract required HRD to arrange transportation and did not allocate the risk of loss pending transportation.

Under Texas contract law, the parties were free to allocate the risk; the parties could contract for less risk and a higher price or more risk for a lower price.  *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912–13 (Tex. 2007).  A court should not allocate risks if the parties have not done so.  *Gym-N-I*, 220 S.W.3d at 912–13 ("[Contracts when entered into freely and voluntarily shall be held sacred and shall by enforced by the Courts.") (quoting *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex. 2005)).  There is no basis in the contract to conclude that HRD is entitled to be reimbursed for processing services Lux performed because the product was destroyed after it was processed but before HRD picked

it up.  The fact that this product was destroyed after it was processed does not in itself breach the contract or establish a basis for HRD to seek reimbursement of the processing costs.

HRD also contends that Lux failed to process the unprocessed wax in the rail cars that had been delivered in May 2005 in a timely fashion.  Texas's codification of the Uniform Commercial Code imposes a duty to complete duties required by a contract within the time agreed or "if no time is agreed, a reasonable time."  TEX. BUS. & COMM. CODE § 1.205 (Vernon 2003); *see also Gulf Oil Corp. v. Reid*, 337 S.W.2d 267, 275 (Tex. 1960) ("Where no time is fixed for performance of any phase of a contract, the law necessarily will imply that it is to be performed within a reasonable time.").  "What is reasonable depends on the facts and circumstances as they existed when the contract was formed. In determining what is reasonable, we consider the nature and character of the action and the difficulty of accomplishing it, as well as the purpose of the agreement. What constitutes a reasonable time is ordinarily a question of fact, but when the facts are undisputed, it becomes a question of law." *Diaz v. State & County Mut. Fire Ins. Co.*, 2007 WL 1481560, at *2 (Tex. App.—San Antonio, May 23, 2007) (citations omitted).

The contract did not set a time for Lux to process HRD's wax after delivery.  HRD has submitted evidence of a "reasonable" period to process wax:  Bolduc stated his affidavit that four to six weeks is a reasonable time for processing wax after delivery.  (Docket Entry No. 27, Ex. B at 2).  There is no evidence as to the amount of time that elapsed between HRD's deliveries and Lux's processing of the large amounts of other wax handled under the parties' contract.  It appears, however, that Lux processed other deliveries in far less time

15

than three months.

In the counterclaim, Lux asserts that it delayed processing the wax in the rail car at issue because of problems with the wax.  Fox testified in his affidavit that the material was unsuitable for Lux's equipment, and that Lux had told HRD about the problem with that train car of wax.  (Docket Entry No. 32, Ex. E at 2).  The record also shows that Lux had notified HRD that the plant was operating at full capacity.  (Docket Entry No. 27, Ex. A at 7).  The record is insufficient to determine whether Lux took an unreasonable time to process the wax in the rail car.  But even if there is a fact issue as to whether Lux took an unreasonable time to process that wax, HRD has not raised a fact issue as to whether it sustained damages caused by that delay.  The only damages HRD has identified from Lux's failure to timely process the wax is that the wax and rail car were still at the Lux plant when the hurricane hit.  That is not a breach of the parties' contract that proximately caused the damages sought.

To the extent HRD seeks actual damages, there is an insufficient causal connection between Lux's delay in processing the raw wax in one of the two HRD rail cars and the hurricane-inflicted damage on that car and the contents.  The only connection is that had Lux processed the wax faster, it might not have been in the rail car in Pass Christian when Hurricane Katrina hit.  Such an attenuated connection does not rise to proximate cause.

The Texas Supreme Court recently recognized the limits of proximate cause.  In *IHS Cedars Treatment Center v. Mason*, 143 S.W.3d 794 (Tex. 2003), the plaintiff was a patient at the defendant hospital.  The plaintiff was discharged from the hospital, picked up by a third party, and injured in an auto accident.  The patient argued that if the hospital had

different discharge policies, she would not have been allowed to leave when she did and would not have been in the driver's car when the accident occurred. *Id.* at 802. The Texas Supreme Court found that the hospital's discharge policies were irrelevant to the driver's behavior that caused the accident and that the hospital's conduct was "too attenuated to have caused the accident." *Id.*

Similarly, in F*idelity and Deposit Ins. v. Swan Roofing, L.L.C.*, 167 S.W.3d 633, 635–36 (Tex. App.—Dallas 2005), the evidence showed that a roof was negligently installed. A small piece of ceiling tile got wet as a result of the negligent roof installation. That piece of tile fell and hit a mirror at an angle, then fell on a faucet, turning it on, and then fell in the sink, clogging the drain. The result was extensive water damage throughout the building. The court found that this "pretty unusual circumstance" was "too remotely connected" with the roof installation to constitute "legal cause." *Id.* In *Taylor v. Carley*, 158 S.W.3d 1, 3 (Tex. App.—Houston 2004, pet. denied), a patient was negligently diagnosed by a psychologist who referred the patient to a psychiatrist. The psychiatrist prescribed inappropriate medication; the plaintiff took more than the recommended dose of that medication and was harmed. The court found that the intervening acts showed that the psychologist's actions were not the proximate cause of the plaintiff's injury. *Id.* at *10. These Texas cases show that in this case, actual damages for hurricane losses to the rail cars and their contents were not proximately caused by Lux's delay in processing the wax.

To the extent that HRD seeks consequential damages for the loss of unprocessed wax based on the processing delay, such damages are also not recoverable, as a matter of law.

"Consequential damages are those damages that result naturally, but not necessarily, from the defendant's wrongful acts.  They are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach." *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998) (citations omitted).  In *Bayless*, the Texas Supreme Court held that an attorney suing his client for failing to pay his fees could not recover as consequential damages contingent fees that he might have earned from other clients.  Such damages were not contemplated as a probable result of breach.  In this case, there is no indication that the parties contemplated that a delay in performing would lead to damages from hurricane or other natural disaster that occurred during the period of delay.

Lux's motion for summary judgment on the breach of contract claim is granted.

## IV.    The Negligence Claim

To prevail on a negligence cause of action, the plaintiff must show the existence of a duty, a breach of that duty, and damages proximately caused by the breach.  *Western Investments, Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).  HRD argues that Lux had a duty to "operate with ordinary care and prudence in the handling and safekeeping of all property placed in its custody."  (Docket Entry No. 27 at 4).  HRD alleges that Lux was negligent because it failed to "have in place a disaster plan designed to care for and safeguard not only its own property but the property of others," and failed to process raw wax in the one of the two HRD rail tank cars on the Lux premises within a reasonable time after it was delivered.  (*Id*. at 5).  Lux argues that HRD has provided no evidence of a lack of ordinary care or that the hurricane-preparation steps taken were unreasonable.  Lux asserts that there

18

is no evidence that any negligence caused the damage to the processed and unprocessed wax or the rail cars. (Docket Entry No. 25 at 10–11).

Lux had a duty to take reasonable steps to prepare for foreseeable damage. In his affidavit, Bolduc stated that he did not believe Lux had an adequate existing disaster plan. Bolduc acknowledged that he is not an expert in disaster planning.

Fox's affidavit describes the hurricane-preparation steps at the Lux plant in detail. Fox emphasized that it was not until August 27, 2005, two days before the storm hit, that there was any clear indication that the storm was likely to pose a significant danger for Pass Christian, Mississippi. At that point, it was too late to bring in trucks to move the 1,000 to 2,000 pound bags of processed wax or to bring in a train to move the rail cars containing raw wax. (Fox Affidavit, Docket Entry No. 27, Ex. B at 2).

Bolduc did not dispute the evidence as to the timing of Lux's knowledge of the storm path. Nor did Bolduc fault the specific disaster preparation steps that Fox described except for the lack of "affirmative" notice to HRD "of [Lux's] conclusion that damage from Hurricane Katrina was imminent." (Bolduc Deposition, Docket Entry No. 32, Ex. A at 51–53). The evidence shows, however, that well before the specific path of Katrina became clear, Bolduc and HRD knew of the potential risk. Bolduc testified that he knew that Hurricane Katrina was approaching and was preparing the HRD plant. Bolduc also arranged to remove a significant quantity of the processed wax from Pass Christian as "risk abatement." (*Id*. at 40–43). The evidence shows that Bolduc was aware of the hurricane danger to HRD's product at the Pass Christian facility, despite the lack of a specific warning

19

from Lux.

Lux had a duty not to contribute through independent negligence to the expected effects of the hurricane. In *Gannett Outdoor Co. of Texas v. Kubeczka*, 710 S.W.2d 79 (Tex. App.—Houston 1986), Hurricane Alicia knocked a large sign over onto a homeowner's property. The record showed that the sign had been improperly maintained. The court found that the sign owner was liable for the negligent maintenance, which "cooperated with" or "concurred with" the hurricane winds in producing the injury. *Id.* at 85–86. In this case, however, the only steps that HRD identifies as negligent were the failure to give HRD more advance information as to the general risk of hurricanes for chemical plants in Pass Christian, Mississippi and the specific risk of Hurricane Katrina. (Bolduc Affidavit, Docket Entry No. 27, Ex. B at 2; Bolduc Deposition, Docket Entry No. 32, Ex. A at 51–53). Bolduc's affidavit stated that had HRD received more advance warning about those risks, it would have "been in a better position to either remove its product from the location or to have chosen to be business with another plant." (Bolduc Affidavit, Docket Entry No. 27, Ex. B at 3). But in his deposition, Bolduc testified that he was generally aware of hurricane risks and specifically aware that Hurricane Katrina was approaching. (Bolduc Deposition, Docket Entry No. 32, Ex. B at 18–22). As noted, Bolduc made arrangements to remove a significant quantity of wax from the Lux plant.

The record shows that neither Lux nor HRD definitively knew Hurricane Katrina's path until August 27, 2005. The record shows that before that date, HRD had taken steps to remove some of the processed wax from Lux's plant. The record also shows that on that

date, steps could not include transporting wax, either processed or raw, away from the Lux plant. Ordinarily, arrangements to move materials from the Lux plant were made 7 to 14 days in advance. Fox stated in his affidavit that by August 27, 2005, there was no transportation available to remove the two rail cars containing raw wax or the 1,000 to 2,000 pound bags of processed wax. Fox stated that there were no heavy trucks available to transport materials from the Lux plant "once it was known that Katrina would likely strike in the area" on August 27, 2005. (Docket Entry No. 25, Ex. A). The rail cars required a train for transportation; no train was available between August 27 and August 29, 2005. Although Bolduc stated conclusorily that HRD "at all material times" had the ability to have products moved from the Lux plant on "short notice," Bolduc did not controvert Fox's statements that after August 27, 2005, no train was available. Bolduc testified that he did not attempt to secure a train in the previous days. (Bolduc Deposition, Docket Entry No. 32, Ex. A at 53). Bolduc also did not controvert Fox's statement that once it was known that Pass Christian was on Hurricane Katrina's predicted path, there was no large truck available to travel into that path. Lux further points out that under the parties' contract, transportation to and from the Lux facility was HRD's responsibility.

The record does not raise a fact issue as to whether Lux's hurricane-preparation steps breached a duty of reasonable care. Nor does the record raise a fact issue as to whether, had Lux specifically notified HRD on August 27, 2005 that Lux believed Hurricane Katrina would pass over Pass Christian, HRD could have made arrangements for trucks and a train to travel to Pass Christian in time to remove the two rail cars loaded with unprocessed wax

and the bags of processed wax.

HRD also alleges that Lux was negligent in failing to process the raw wax in one of the rail cars in a reasonable time. As discussed earlier, even if there is a fact issue as to whether Lux had a duty to process the wax earlier, which was breached, as a matter of law that breach did not cause Hurricane Katrina to damage the rail car and contents. *See IHS Cedars Treatment Center v. Mason*, 143 S.W.3d 794 (Tex. 2003). Lux's summary judgment motion is granted on the negligence cause of action.

## IV.   The Bailment Claim

HRD alleges that Lux violated its duties as a bailee. "In a bailment for mutual benefit, a rebuttable presumption of negligence and a *prima facie* case of liability is established by a bailor against the bailee upon proof that the bailed chattel was not returned." *Buchanan v. Byrd*, 519 S.W.2d 841 (Tex. 1975). "To rebut a presumption of negligence, the bailee must show that the damage was not caused by any act or omission on its part and that it exercised due care in all that it did with respect to the bailed article." *Valley Line Co. v. Musgrove Towing Service, Inc*., 654 F. Supp. 1009 (S.D. Tex. 1987). The parties agree that the arrangement was a mutual-benefit bailment and that the products were either not returned or, with the rail cars, not returned in the condition in which they were delivered. (Docket Entry No. 25 at 9; Docket Entry No. 27 at 5–6).

HRD argues that Lux has not overcome the presumption of negligence. HRD cites to *Buchanan v. Byrd*, 519 S.W.2d 841. In that case, the gate to a pasture was found open when horses—the subject of the bailment—went missing. The court found that evidence that the gates and fences were in good repair did not rebut the presumption of negligence. 519 S.W.2d at 843.

Lux argues that it has overcome the presumption of negligence because the evidence shows that Hurricane Katrina caused the damage. Because it is undisputed that Hurricane Katrina was an "act of God," Lux asserts that as a matter of law, the presumption of negligence arising from its inability to return the bailed goods in the condition in which they were delivered is rebutted. "[A]n act of God is defined as any accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected, could have been prevented." *Union Pac. R. Co. v. Heartland Barge Mgmt., L.L.C.*, 2006 WL 2850064, at *13 (S.D. Tex. 2006). In *Valley Line Co. v. Musgrove Towing Serv., Inc.*, 654 F.Supp. 1009, 1011 (S.D. Tex. 1987), which involved a barge towing service damaged by a hurricane, the court defined an act of God as "a catastrophe which triumphs over the safeguards by which skillful and vigilant seamen normally bring ship and cargo to safety." *Id.* at 1012. HRD does not dispute that Hurricane Katrina was an act of God, but does argue that Lux lacked "adequate protective measures." (Docket Entry No. 27 at 7).

The summary judgment evidence does not raise a fact issue as to whether Lux's hurricane-preparation measures were inadequate, such that an act of God would nonetheless fail to rebut the presumption of negligence. The record shows that Lux took reasonable steps to protect the equipment, structures, and inventory at its Pass Christian plant, but was limited in what it could do to move inventory or equipment to a safe place because the path of the storm became clear only two days before it hit. The record also shows that the effectiveness of what Lux did was limited by the unprecedented force of the storm and height of the resulting surge. Given the uncontroverted evidence as to what Lux and HRD did to prepare, there is no basis to find a disputed fact issue as to whether Lux's preparations were negligent or whether those steps contributed to the damage resulting from the hurricane.

Based on the record, Lux has rebutted the presumption of negligence. Lux's motion for summary judgment is granted as to HRD's bailment claim.

## V.    The Constructive Trust Claim

HRD argues that Lux has retained insurance proceeds from claims for HRD's property, making Lux a constructive trustee for those proceeds. Under Texas law, a constructive trust is established when a party commits fraud or breaches a fiduciary relationship to unjustly enrich himself. *Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex. 1974); *see also Baker Botts, L.L.P. v. Cailloux*, 2007 WL 460643, at *11 (Tex. App.—San Antonio Feb 14, 2007).

HRD argues that there are disputed issues of fact material to determining whether Lux "represented to third parties that it accepted liability for [HRD's] losses" and whether Lux "received indemnity for losses to [HRD's] property." (Docket Entry No. 27). HRD submits evidence that Zhu told Bolduc that Lux had insurance coverage for third-party property damaged in the hurricane. Bolduc stated in his affidavit that Zhu "assured me that Lux International had maintained insurance coverage for the property of third parties, including HRD Corporation." (Docket Entry No. 27, Ex. B at 3). HRD also submitted an email from Lux's insurance adjustor stating that Lux would include third-party property loss in the claim submitted to the insurer. The email from Leonard Orloff to Michael Landrum at HRD stated: "Smith Orloff & Associates is representing Lux International in the preparation and adjustment of their insurance losses as a result of Hurricane Katrina. The goods in Lux International's possession belonging to HRD will be included in our claim presentation. Naturally it will be necessary to verify the value and amounts of the product in the insured's possession as well as the value and damage to the rail cars." (Docket Entry No. 27, Ex. D).

Lux argues that it did not submit insurance claims for HRD's property and that the insurance proceeds it received were inadequate to cover its own losses, much less losses to third-party property at the Lux plant. (Docket Entry No. 25 at 11–12). The record contains a claim submitted by Lux for damages from Hurricane Katrina. That claim is for "Stock & inventory, Machinery & equipment, Clean-up & debris, Packaging, Shelving, and Electric." (Docket Entry No. 27, Ex. C at 2). This document does not identify what is included in those categories. Lux submitted an affidavit by Orloff stating that Lux did not submit an insurance

claim for third-party property.  (Docket Entry No. 25, Ex. 3).  In its response, Lux submitted the itemized description that it used to claim its insurance benefits.  (Docket Entry No. 32, Ex. D).  Lux's insurance adjuster attached an affidavit that none of the property in the itemized claim was HRD's property.  (*Id.*).  Orloff submitted an additional affidavit explaining that Lux had intended to make a claim for HRD's property but concluded that the policy's limit would be insufficient to cover Lux's own losses in the storm.  (*Id.*, Ex. F).

Although Orloff's email and Zhu's alleged statements are inconsistent with Orloff's first affidavit, his later affidavit explains the inconsistency.  The record shows that assuming that Lux carried coverage on third-party property, the coverage amounts did not approach Lux's losses.  The evidence shows that Lux did not submit an insurance claim for HRD's property after Hurricane Katrina.

Lux's motion for summary judgment on the constructive trust claim is granted.

## VI.    Conclusion

Lux's motion for summary judgment is granted.  (Docket Entry No. 25).  The remaining motion for continuance of pretrial deadlines is denied as moot.  (Docket Entry No. 31).

The parties are to advise this court of any remaining issues in this case or whether dismissal is appropriate by **July 25, 2007**.

SIGNED on July 17, 2007, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge